**STATE of Utah, Plaintiff and Appellee,**

v.

**Jose A. Fidel GARCIA, Defendant and Appellant.**

**No. 970443–CA.**

Court of Appeals of Utah.

July 16, 1998.

Scott C. Williams, Salt Lake Legal Defender Ass'n, Salt Lake City, for Defendant and Appellant.

E. Neal Gunnarson, Salt Lake Dist. Atty., and J. Kevin Murphy, Dist. Atty. for Salt Lake County, Salt Lake City, for Plaintiff and Appellee.

Before DAVIS, P.J., WILKINS, Associate P.J. and GREENWOOD, J.

## OPINION

GREENWOOD, Judge:

Jose A. Fidel Garcia appeals the trial court's ruling allowing the State to invoke a statutory presumption that Garcia's breath alcohol test results were valid. Garcia argues his test results were inadmissible be-cause the State failed to meet the standards established by the Department of Public Safety for administration of breath alcohol tests. We reverse, concluding the statutory presumption was not available to the State in this case.

## BACKGROUND

On April 6, 1996, Garcia was cited for speeding and driving under the influence. Garcia was then subjected to a breath alcohol test. Garcia's test was conducted on a series 5000 Intoxilyzer instrument. At least every forty days, Highway Patrol Trooper Scott Hathcock completed calibration tests on that instrument to ensure its accuracy. As part of this procedure, Trooper Hathcock tested the instrument using "known reference samples"—i.e., breath samples with a known alcohol content—to confirm that the instrument accurately read those samples to within plus or minus .005 or five percent of the actual alcohol content. For the period relevant to Garcia's test, Trooper Hathcock recorded the results of these reference sample tests as "OK," indicating his opinion that the results were within an acceptable margin of error. He did not, however, record the actual numerical results obtained.

Before trial, Garcia filed a Motion to Suppress Results of Breath Test Based on Due Process Violations and State's Violation of Utah Code. Garcia argued that Trooper Hathcock's method of recording the reference sample test results violated Rule 714–500 of the Utah Administrative Code, requiring that the evidence of his breath alcohol test be suppressed. The trial court denied Garcia's motion.

Garcia pleaded guilty to driving under the influence but reserved his right to appeal the trial court's ruling on his motion to suppress. *See State v. Sery,* 758 P.2d 935, 939 (Utah Ct.App.1988) (recognizing conditional pleas). This appeal followed.

## ISSUES AND STANDARD OF REVIEW

■ There are essentially two issues presented on appeal. The first is whether the trial court erred in interpreting Rule 714–500

of the Utah Administrative Code. Because the answer is purely a matter of statutory construction, we review the trial court's decision for correctness. *See Salt Lake City v. Emerson,* 861 P.2d 443, 445 (Utah Ct.App. 1993).

If the trial court did err, the second issue is whether this particular violation of the Rule requires exclusion of Garcia's breath test evidence under section 41–6–44.3 of the Utah Code or suppression of that evidence under the Federal Due Process Clause. Because of its ruling on the first issue, the trial court did not reach this issue.

## ANALYSIS

### *Recording Requirement of Rule 714–500*

Garcia argues the trial court erred in ruling that the recording of reference sample test results as "OK" complied with Rule 714–500 of the Utah Administrative Code. He asserts that under the Rule, results of such tests conducted on series 5000 Intoxilyzers must be recorded to at least three decimal places.

Section 41–6–44.3 of the Utah Code, which allows for admission of documentary evidence as foundation to create a presumption of breath alcohol test result validity, directs the commissioner of the Department of Public Safety to issue regulations governing the procedures for breath alcohol tests. *See* Utah Code Ann. § 41–6–44.3(1) (1993). Rule 714–500 of the Utah Administrative Code was promulgated pursuant to that directive. *See* Utah Admin. Code R714–500–2A (1996).

Rule 714–500–5 addresses the requirements for "Instrument Certification." *Id.* R714–500–5. Subsection 714–500–5A states that "[a]ll breath alcohol testing instruments . . . to be used for evidentiary purposes must be certified by brand and/or model by the Department." *Id.* R714–500–5A. Subsection 714–500–5B(3) states that "[t]he instrument shall analyze a reference sample . . ., the result of which must agree with the reference sample predicted value within plus or minus .005 or 5% whichever is greater or

such limits as set by the Department." *Id.* R714–500–5B(3). Subsection 714–500–5E provides that "[a]fter certification if it is determined by the Department that a specific instrument is unreliable and/or unserviceable, it will be removed from service and, [sic] certification may be withdrawn." *Id.* R714–500–5E.

Rule 714–500–6 addresses the requirements for "Program Certification." *See id.* R714–500–6. This section sets forth the criteria which law enforcement entities must meet in order to maintain a breath testing program. *See id.* R714–500–6D. Subsection 714–500–6D(1) requires that results of tests on a person's breath be expressed in grams per 210 liters and "be entered in a permanent record book." *Id.* R714–500–6D(1). Subsections 714–500–6D(3) and (4) require that a certified technician perform calibration tests "to certify the instruments" at least every forty days. *Id.* R714–500–6D(3), (4). One of these tests is the reference sample test, *see id.* R714–500–6D(4)2(g), the results of which "shall be kept in a permanent record book," *id.* R714–500–6D(5). Finally, subsection 714–500–6D(6) states, "[a]ll analytical results shall be . . . reported . . . to three decimal places for a 5000 series intoxilyzer. (For example, a result of 0.237g/210L shall be reported as . . . 0.237 on a 5000 series intoxilyzer, or as stated by the Department.[) ]." *Id.* R714–500–6D(6).

It is this last subsection that Garcia argues Trooper Hathcock violated when he chose to record reference sample test results as "OK." According to Garcia, this subsection requires that such results be recorded to three decimal places. In response, the State argues that nothing in the plain language of the Rule explicitly states that the three decimal recording requirement applies to the results of reference sample tests. Accordingly, the State contends, the "analytical results" terminology in Rule 714–500–6D(6) does not apply to results of reference sample tests but, rather, applies only to results of tests conducted on actual arrestees.[1]

---

1. Alternatively, the State urges this court to give some deference to Trooper Hathcock's interpre-

tation of the Rule. Generally, an agency's interpretation of its own rules, especially where the

■ "When faced with a question of statutory construction, we look first to the plain language of the statute." *Stephens v. Bonneville Travel, Inc.*, 935 P.2d 518, 520 (Utah 1997) (citation omitted). If the plain language is ambiguous, we may "seek guidance from the legislative history and relevant policy considerations." *World Peace Movement v. Newspaper Agency, Inc.*, 879 P.2d 253, 259 (Utah 1994). However, where that guidance is insufficient, we must return to the regulation's language and give it "a reasonable and sensible construction." *State v. GAF Corp.*, 760 P.2d 310, 313 (Utah 1988) (citations omitted). We must attempt to construe the regulation " 'so that effect is given to all its provisions,' " *Brickyard Homeowners' Ass'n v. Gibbons Realty Co.*, 668 P.2d 535, 538 (Utah 1983) (citation omitted), and we must assume "that 'each term in the [regulation] was used advisedly; thus the ... words are read literally, unless such a reading is unreasonably confused or inoperable,' " *Stephens*, 935 P.2d at 520 (citation omitted).

■ As indicated above, the State's primary argument is that no violation of Rule 714–500 occurred in this case because nothing in Rule 714–500 plainly requires that reference sample test results be recorded to three decimal places. The State appears to rely most heavily on the fact that subsection 714–500–5, which requires reference sample testing before an instrument may be initially certified, contains no provision concerning how those test results should be recorded. Although we agree that the Rule is not a model of clarity, we nonetheless conclude that the State's argument, in light of the rules of construction set forth above, is untenable. Although we have no legislative history to guide us, we conclude that subsection 714–500–6D(6), when considered in context, requires that the results of reference sample tests, at least when those tests are

conducted to ensure the continued accuracy of an instrument already certified under subsection 714–500–5, be recorded to at least three decimal places.

Preliminarily, we note that the reference sample tests at issue in this case are part of a series of calibration tests that must, as the State concedes, be conducted at least every forty days to ensure instrument accuracy. *See* Utah Admin. Code R714–500–6D(3), (4). We also note that although both subsection 714–500–6D(1), addressing arrestee breath tests, and subsection 714–500–6D(5), addressing reference sample tests, require that results be recorded, neither indicates exactly how this should be done. Only subsection 714–500–6D(6), which follows immediately after the provision that requires sample test results to be recorded, sets forth any method of recording, requiring that "[a]ll analytical results shall be ... reported ... to three decimal places for a 5000 series intoxilyzer."

However, contrary to the State's contention, nothing in the language of subsection 714–500–6D(6) or its location indicates an intent to exempt reference sample test results from its requirement. If, as the State suggests, the three decimal place requirement were intended to apply only to arrestee test results, one would expect that requirement to appear closer to the subsection directly dealing with arrestee tests. Instead, subsection 714–500–6D begins with two provisions addressing arrestee testing. *See id.* R714–500–6D(1), (2). Those provisions are followed by three provisions addressing the periodic calibration testing, of which reference sample tests are a part. *See id.* R714–500–6D(3), (4), (5). The three decimal requirement does not appear until immediately after the calibration testing regulations. The obvious implication is that the recording re-

---

Legislature has granted the agency discretion in that area, is subject to deference by a reviewing court. *See, e.g., Brown & Root Indus. v. Industrial Comm'n*, 947 P.2d 671, 677 (Utah 1997) (stating when reviewing Industrial Commission's "application of its own rules, this court will not disturb the agency's interpretation or application of one of the agency's rules" absent "an abuse of discretion."). However, in this case, the State concedes it has no evidence that the commission-

er of the Department of Public Safety adopted or in any way endorsed the method of recording used by Trooper Hathcock. *See E.C. Olsen Co. v. State Tax Comm'n*, 109 Utah 563, 578, 168 P.2d 324, 332 (1946) (stating "[f]or the so-called practical interpretation to have any weight it must be shown that it was an interpretation adopted by the [agency]."). We thus conclude that no deference is due Trooper Hathcock's interpretation.

quirement applies equally to the reference sample tests and the arrestee tests.[2]

Thus, we conclude that the three decimal place recording requirement found in subsection 714–500–6D(6) applies to results of reference sample tests. Trooper Hathcock's decision to record those results as "OK," then, was a violation of the Rule.

### *Remedy for Violation*

Garcia argues the violation requires that his breath test results be either excluded under section 41–6–44.3 or suppressed under the Federal Due Process Clause. He asserts this remedy is necessary because the subsection was designed to ensure instrument accuracy and because the violation impermissibly denies him the ability to challenge his test results by reference to the actual deviation factor measured on his particular instrument. The State contends neither of these harsh remedies is necessary because the violation does not in fact undermine the accuracy of the instrument used on Garcia and because the "OK" notation does not materially impede Garcia's defense. If any remedy is necessary, the State argues, that remedy should be limited to the inability of the State to invoke the presumption provided under section 41–6–44.3.

### 1. Section 41–6–44.3, Rule 714– 500, and Exclusion

The State contends that because the violation at issue in no way undermines the actual accuracy of the instrument used on Garcia, the State should not be precluded from invoking the presumption provided in section 41–6–44.3. Even if the violation does remove the evidence from treatment under section 41–6–4.3, the State argues, removal does not require exclusion of the evidence but merely requires the State to produce live testimony to establish the necessary foundation prior to its admission. Garcia disagrees, asserting that the evidence must be excluded under both section 41–6–44.3 and Rule 714–500.

■ Utah Code Ann. § 41–6–44.3 provides:

(1) The commissioner of the Department of Public Safety shall establish standards for the administration and interpretation of chemical analysis of a person's breath, including standards of training.

(2) In any action or proceeding in which it is material to prove that a person was operating or in actual physical control of a vehicle while under the influence ..., documents offered as memoranda or records of acts, conditions, or events to prove that the analysis was made and the instrument used was accurate, according to standards established in Subsection (1), are admissible if:

(a) the judge finds that they were made in the regular course of the investigation at or about the time of the act, condition, or event; and

(b) the source of information from which made and the method and circumstances of their preparation indicate their trustworthiness.

(3) If the judge finds that the standards established under Subsection (1) and the conditions of Subsection (2) have been met, there is a presumption that the test results are valid and further foundation for introduction of the evidence is unnecessary.

Utah Code Ann. § 41–6–44.3 (1993). The purpose of section 41–6–44.3 is "to relieve [prosecutors] of the financial burden of calling as a witness in every DUI case the public officer responsible for testing the accuracy of the breathalyzer equipment." *Murray City v. Hall,* 663 P.2d 1314, 1320 (Utah 1983). It achieves this purpose by allowing replacement of such "live" testimony with affidavits and other documentary evidence. *See id.* The statute then provides a rebuttable presumption that breath tests conducted on that particular instrument are valid. *See id.* at 1321.

However, before the State may invoke the statutory presumption, section 41–6–44.3 requires

---

**2.** In further support of our conclusion that the term "analytical results" includes results of reference sample tests, we note that subsection 714–500–5(B)(3), located in the instrument certi-

fication portion of the Rule, states "instrument[s] shall *analyze* a [known] reference sample." (Emphasis added.)

an affirmative finding by the trial court that (1) the calibration and testing for accuracy of the breathalyzer and the ampoules were performed in accordance with the standards established by the Commissioner of Public Safety, (2) the affidavits were prepared in the regular course of the public officer's duties, (3) that they were prepared contemporaneously with the act, condition or event, and (4) the "source of information from which made and the method and circumstances of their preparation were such as to indicate their trustworthiness."

*Hall,* 663 P.2d at 1320 (quoting Utah Code Ann. § 41–6–44.3). Absent such finding, the presumption is not available. *See id.* at 1319, 1320 n. 4 ("We will not imply such findings, especially when the admission of evidence under § 41–6–44.3 intrudes upon an accused's constitutional right of confrontation."); *Salt Lake City v. Emerson,* 861 P.2d 443, 447 (Utah Ct.App.1993) (stating failure to comply with standards "means that the foundation and validity of the evidence may not be presumed"); *Bountiful City v. Maestas,* 788 P.2d 1062, 1065 (Utah Ct.App.1990) (holding "trial court's failure to make affirmative findings before admitting the affidavits is reversible error.").

In this case, Trooper Hathcock's method of recording reference sample test results violated Rule 714–500. Thus, it would seem the State cannot meet the requirements set forth in *Hall* and therefore cannot take advantage of the presumption provided in section 41–6–44.3. However, the State argues for a different result.

The State contends the primary concern of section 41–6–44.3 is to ensure that tests are conducted on accurate instruments. Under Rule 714–500, the State appears to argue, that concern is addressed only in subsection 714–500–5, the instrument certification portion of the Rule. According to the State, the recording requirement of subsection 714–500–6D(6), which appears in the program certification portion of the Rule, is independent of and has no effect on an instrument's certification under subsection 714–500–5. Thus, the State concludes, the statutory presumption should still be available to the

State. Garcia counters that, although the recording requirement does appear under the program certification portion of the Rule, subsection 714–500–6D governs the procedure by which an instrument is tested to ensure continued accuracy. He contends that the instrument certification portion of the Rule, which empowers the Department to decertify an instrument that is no longer reliable, *see* Utah Admin. Code R714–500–5E, necessarily incorporates the instrument-accuracy-related aspects of the program certification procedures in subsection 714–500–6.

We believe the plain language of section 41–6–44.3 and the holding in *Hall* dispose of the State's contention. Section 41–6–44.3 clearly states that the trial court must find "that the standards established [by the commissioner of the Department of Public Safety] under Subsection (1) . . . have been met" before "there is a presumption that the test results are valid." Utah Code Ann. § 41–6–44.3(3). *Hall* confirms that requirement in holding that the trial court must find that "the calibration and testing for accuracy of the breathalyzer . . . were performed in accordance with the standards established by the Commissioner of Public Safety." *Hall,* 663 P.2d at 1320. Although subsection 714–500–6 is entitled "Program Certification," there is no real dispute between the parties that certain procedures set forth in that subsection also serve to establish an instrument's continuing accuracy. The State concedes as much when it acknowledges that instruments must be tested for accuracy every forty days—a requirement set forth in the program certification portion of the Rule, subsection 714–500–6, not in the instrument certification portion of the Rule, subsection 714–500–5. Thus, even assuming arguendo that the language of section 41–6–44.3 and *Hall* refer only to those standards of Rule 714–500 pertaining to instrument accuracy, there can be no doubt that the reference sample testing required under subsection 714–500–6D is included in those standards. A violation of the procedures applicable to those reference sample tests, then, is a violation that precludes the State from invoking

the statutory presumption provided under section 41–6–44.3.[3]

■ However, this conclusion does not require that evidence of Garcia's test result be excluded altogether. Despite Garcia's contention, nothing in section 41–6–44.3 precludes admission of other foundational evidence to establish the accuracy of the instrument at issue or of Garcia's particular test results. Section 41–6–44.3 does not purport to address the admissibility of breath test evidence in all cases. Rather, it merely defines those conditions under which a prosecutor may invoke a rebuttable presumption

that breath test evidence is accurate and reliable. If the conditions are not met, the statutory presumption is not available. The statute reaches no further. *Cf. Emerson,* 861 P.2d at 447; *State v. Vigil,* 772 P.2d 469, 470–71 (Utah Ct.App.1989) (accepting testimony of operator and technician to establish foundation for admission of breath test results, noting once foundational requirements are met, "any question about the accuracy of the intoxilyzer goes to the weight given the test by the trier of fact."). The breath test evidence, then, remains admissible, subject to traditional foundational requirements.[4]

---

**3.** In its argument, the State relies on *Salt Lake City v. Emerson,* 861 P.2d 443 (Utah Ct.App. 1993). In *Emerson,* this court suggested in dicta that subsection 714–500–6D "establishes the criteria for certification of a breath testing program, not the requirements for obtaining a presumptively valid and admissible breath test result." *Id.* at 446. The State argues that this statement reflects an understanding that even if Trooper Hathcock failed to follow the procedures for program certification, "[n]oncompliance with program certification requirements . . . does not affect whether an instrument was properly certified—i.e., shown to be functioning accurately," and thus does not affect the State's ability to present the evidence under section 41–6–44.3. However, as already stated, the State concedes that certain procedures set forth in subsection 714–500–6 do serve to establish an instrument's continuing accuracy. Thus, by the State's own admission, *Emerson* cannot stand for the proposition that none of the requirements set forth in subsection 714–500–6 affect instrument certification; rather, *Emerson* can only mean that certain of those requirements—such as the one at issue in that case—do not affect instrument certification.

Furthermore, the comment on which the State relies was made in the context of an exclusion argument made by the defendant, not an argument as to which standards must be followed under section 41–6–44.3. The *Emerson* court itself distinguished between the two arguments when it rejected the defendant's exclusion argument but noted that "failure to fully comply with [the administrative] standards . . . means that the foundation and validity of the evidence may not be presumed." *Id.* at 447. *Emerson,* then, does not support the State's argument here.

**4.** Our conclusion is similar to that reached by other jurisdictions considering a regulatory violation. *See Keel v. State,* 609 P.2d 555, 558 (Alaska 1980) (holding test result inadmissible where regulation required calibration by "instructor" and there was insufficient evidence that instructor completed same because failure "casts doubt on the accuracy of the calibration and hence on the reliability of the results"); *Oveson v. Munici-*

*pality of Anchorage,* 574 P.2d 801, 805 (Alaska 1978) (noting mere clerical error makes presumption of validity inapplicable but does not require exclusion of test results unless there is "a showing that the validity of the results is tainted."); *Munn v. State,* 257 Ark. 1057, 521 S.W.2d 535, 538 (1975) (holding blood test conducted within three hours of accident instead of two required by rule was substantial compliance where deviation was not prejudicial to appellant); *People v. Bowers,* 716 P.2d 471, 475 (Colo. 1986) (holding absence of strict compliance does not make test results inadmissible provided deviation "has [not] so impaired the validity and reliability of the testing method and the test results as to render the evidence inadmissible"); *State v. Wills,* 359 So.2d 566, 568–69 (Fla.Ct.App. 1978) (per curiam) (refusing to interpret rule that machine be kept in location " 'only . . . accessible to an authorized technician' . . . so strictly as to mean that it must be *impossible* for anyone other than authorized personnel to obtain the key" and allowing "reasonable compliance," but noting easy access would require exclusion of breath test evidence); *State v. Brown,* 109 Ohio App.3d 629, 672 N.E.2d 1050, 1051 (1996) (noting "[s]ubstantial compliance with administrative rules is required for the admissibility of . . . test results"); *State v. Koch,* 108 Ohio App.3d 572, 671 N.E.2d 333, 334 (1996) (excluding evidence where state failed to test for radio frequency interference on all three bands which could possibly affect results); *Fairres v. State,* 872 P.2d 942, 945–46 (Okla.Ct.App.1994) (holding use of previously accepted notation to record machine maintenance test instead of notation in form currently required is "substantial compliance" to extent old notation reflects same results, noting "purpose of the verification analysis . . . is to ensure the reliability of breath-alcohol testing"). The rule reflected in these cases is that, so long as there is substantial compliance with the regulations governing breath instrument calibration and testing procedures, any deviation from those regulations that does not undermine the accuracy of the instrument or a defendant's test results does not require exclusion of test results. We

We thus hold that section 41–6–44.3 does not prevent the admission of Garcia's test result. Although the violation in this case precludes the State from invoking section 41–6–44.3's presumption of test validity, the evidence remains admissible if the State can establish an adequate foundation by means other than the hearsay evidence allowed under that section.[5]

## 2. Due Process and Suppression

Garcia asserts that even if his breath test evidence is not excludable under section 41–6–44.3, the evidence must be suppressed under the Federal Due Process Clause[6] both because the violation denied Garcia access to evidence which might have aided his defense and because the State failed to adhere to its regulatory procedure. The State responds that the violation at issue is not one of constitutional proportion because the evidence "lost" is not sufficiently exculpatory to be protected under the Due Process Clause and because the violation does not infringe upon any statutory right Garcia might have under section 41–6–44.3.

### a. Exculpatory Evidence

 The Due Process Clause provides two forms of protection to a criminal defendant.[7] First, it guarantees a defendant access to evidence "that is either material to the guilt of the defendant or relevant to the punishment to be imposed" so as to ensure that "defendants [are] afforded a meaningful opportunity to present a complete defense." *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984).

However, this guarantee does not provide a defendant access to all potentially exculpatory evidence; rather, evidence is "material" only if it "might be expected to play a *significant* role in the suspect's defense." *Id.* at 488, 104 S.Ct. at 2534 (emphasis added). To meet this standard, "evidence must *both* possess an [apparent] exculpatory value ... *and* be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489, 104 S.Ct. at 2534 (emphasis added) (citation omitted).

 Garcia argues that Trooper Hathcock's failure to record the exact numerical results of the reference sample tests deprived him of "a meaningful opportunity to present a complete defense" by destroying potentially exculpatory evidence. The State asserts, however, that a defendant is not significantly disadvantaged—if disadvantaged at all—by the lack of those numerical results. According to the State, the instrument accuracy required under Rule 714–500 is so exact that any measured deviation within the margin of error is typically unhelpful to defendants; because the exact numerical result often will *not* be materially exculpatory, the State has no obligation under the Due Process Clause to provide a defendant with that data. According to the State, providing a defendant with information on the allowable margin of error is sufficient.

We believe *Trombetta* is on point and supports the State's argument. In *Trombetta,* the respondents argued that the state violated the Due Process Clause when it destroyed

---

believe our holding reaches the same result: If a violation seriously undermines the accuracy of the instrument or a defendant's test results, the State will not be able to establish the foundation necessary to have the defendant's test results admitted. In such cases, the evidence would be excludable for lack of proper foundation.

margin of error allowed under the Rule. Thus, Garcia essentially concedes that Trooper Hathcock's violation did not seriously detract from the accuracy of the instrument used to test Garcia's breath. Thus, we have no reason to conclude that the violation at issue here somehow automatically decertified that instrument.

**5.** In reaching this conclusion, we reject Garcia's contention that subsection 714–500–5A, which states that "[a]ll breath alcohol testing instruments ... to be used for evidentiary purposes must be certified by brand and/or model by the Department," requires exclusion of his breath test results. In this case, Garcia acknowledges that Trooper Hathcock's "OK" notation indicated the instrument was functioning within the

**6.** Because Garcia provides no separate analysis for his state constitutional claim, we do not separately address that claim. *See State v. Carter,* 812 P.2d 460, 462 n. 1 (Utah Ct.App.1991).

**7.** The Federal Due Process Clause states: "No State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const.amend. XIV, § 1, cl. 2.

breath samples of arrestees charged with being under the influence. The Court found no duty to preserve the samples because "the chances are extremely low that preserved samples would have been exculpatory." *Id.* at 489, 104 S.Ct. at 2534. Furthermore, "[e]ven if one were to assume that the Intoxilyzer results in this case were inaccurate and that breath samples might therefore have been exculpatory, it does not follow that respondents were without alternative means of demonstrating their innocence." *Id.* at 490, 104 S.Ct. at 2534. Respondents had other methods by which to impeach both the instrument's reliability and the accuracy of their particular test results. *See id.,* 104 S.Ct. at 2534; *cf. Medina v. California,* 505 U.S. 437, 451, 112 S.Ct. 2572, 2580, 120 L.Ed.2d 353 (1992) ("'Due process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person.'" (citation omitted)).

As Garcia concedes, the reference sample test result evidence provided him indicates that the instrument used to conduct his test was operating within the small margin of error allowed under Rule 714-500. Although the actual numerical results would provide Garcia with the exact error measured on the calibration test date, we do not believe such evidence would be more beneficial to Garcia than Trooper Hathcock's "OK" notation. Indeed, the "OK" allows Garcia to emphasize a possible .005 or five percent deviation—the largest allowed under the Rule—even though the actual deviation may have been much smaller. Thus, we find no apparent exculpatory value in the exact numerical result of reference sample tests when compared to the margin of error information provided.

In addition, Garcia has "alternative means of demonstrating [his] innocence." *Trombetta,* 467 U.S. at 490, 104 S.Ct. at 2534. He may question Trooper Hathcock, for example, or present any other evidence available—including the margin of error allowed under Rule 714-500—to impeach both the instrument's reliability and the accuracy of his particular test results. *Cf. Hall,* 663 P.2d at 1322 (rejecting "right to confrontation" challenge to section 41-6-44.3, stating "if an

accused feels that the machine was not functioning properly or wants to prove noncompliance with the standards established by the Commissioner of Public Safety, he/she can subpoena the public officer responsible for testing the accuracy of the breathalyzer").

Thus, we conclude the State has not violated Garcia's due process rights in failing to provide him with the exact numerical results of reference sample tests conducted by Trooper Hathcock.

### b. Procedural Due Process

The second form of protection provided under the Due Process Clause requires that states follow certain procedural rules where failure to do so implicates a constitutional, statutory, or regulatory right of the defendant. *See United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 265, 74 S.Ct. 499, 502, 98 L.Ed. 681 (1954) (stating "crucial question is whether the alleged conduct ... deprived petitioner of any of the rights guaranteed him by the statute or by the regulations issued pursuant thereto."); *cf. United States v. Caceres,* 440 U.S. 741, 749, 99 S.Ct. 1465, 1470, 59 L.Ed.2d 733 (1979).

 In this case, we can identify two possible rights which this form of due process protects. The first would be Garcia's right to exculpatory evidence. As our discussion above indicates, that right has not been violated.

The second right protected would be any right created by section 41-6-44.3 and the Rule promulgated thereunder. The State argues that the only right provided under section 41-6-44.3—the source of authority to promulgate the Rule—is the right to "be tested with an accurate instrument." *See Bountiful City v. Maestas,* 788 P.2d 1062, 1064 (Utah Ct.App.1990) (stating purpose underlying testing requirements is "to guarantee that breath testing equipment functions properly and renders accurate results." (citing *Hall,* 663 P.2d at 1320)). We agree and, based on our discussion above, hold that such right was not violated here.

We thus conclude that admission of Garcia's breath test results upon presentation of adequate nonhearsay foundational evidence

by the State would not offend the Due Process Clause.

## CONCLUSION

We conclude the trial court erred in ruling that Trooper Hathcock's method of recording results of reference sample tests complied with Rule 714–500. Because noncompliance precluded admission of Garcia's breath test evidence under section 41–6–44.3, we also conclude the trial court erred in ruling that the State could invoke the statutory presumption provided by that section. However, because the regulatory violation here did not undermine the accuracy of the instrument used on Garcia or interfere with Garcia's ability to present a complete defense, we conclude the breath test evidence against Garcia is admissible, provided the State lays an adequate foundation without relying on the hearsay evidence allowed under section 41–6–44.3. We thus reverse the trial court's ruling.

DAVIS, P.J., and WILKINS, Associate P.J., concur.