1999 UT 108

**STATE of Utah, Plaintiff and Appellant,**

v.

**James and Jeanne REDD, Defendants and Appellees.**

**No. 981747.**

Supreme Court of Utah.

Dec. 28, 1999.

Jan Graham, Att'y Gen., Joanne C. Slotnik, Asst. Att'y Gen., Salt Lake City, and William L. Benge, Moab, for plaintiff.

Walter F. Bugden, Jr., Salt Lake City, William L. Schultz, Moab, and Rod W. Snow, Denver, Colorado, for defendants.

ZIMMERMAN, Justice:

¶ 1 The State of Utah appeals from a magistrate's dismissal of a charge against James and Jeanne Redd for violating section 76–9–704(1)(a) of the Code by the removal, concealment, or failure to report the finding of a dead body to a local law enforcement agency, or destruction of a dead body or any part of it.[1] We agree with the State that the magistrate erred in his interpretation of the statute by concluding that the facts alleged did not constitute a violation, and in dismissing the charges. We reverse and remand for actions consistent with this opinion.

---

1. The court of appeals certified this case to this court pursuant to rule 43 of the Utah Rules of Appellate Procedure, which provides: "In any case over which the Court of Appeals has original appellate jurisdiction, the court may ... cer-tify a case for immediate transfer to the Supreme Court for determination." Utah R.App. P. 43(a). We assume jurisdiction under section 78–2–2(3)(b) and (5) of the Utah Code.

¶ 2 For clarity, we explain the entire history of this case. In January of 1996, Ben Naranjo of the San Juan County Sheriff's Department was contacted by Mike Pehrson, a resident of Bluff, Utah. Pehrson informed Naranjo that he had witnessed several people digging in an area known to have Anasazi ruins. Naranjo drove close to the dig site where he saw the Redds. They asked Naranjo what he was doing there. He responded that someone had observed them digging in the area.

¶ 3 James Redd ("James") stated that they were on Erv Guymon's property and that Guymon had given them permission to be there. Naranjo spoke with Guymon who said that the Redds did have permission to be on the property but not to dig. Guymon said that he would handle the problem with the Redds personally. Despite James' claim that he was on Guymon's property, Naranjo decided to verify ownership of the dig site. A survey was conducted and it was determined that the site was on state land. The San Juan County Sheriff then called in Dale Davidson, an archaeologist, to examine the site.

¶ 4 In October of 1996, the Redds were charged with abuse or desecration of a dead human body, in violation of 76–9–704(1)(b).[2] A preliminary hearing was held in March of 1997. Davidson, the archaeologist, testified that the Redds had dug in an archaeological site, which included a kiva, a building, and a midden area. Davidson also testified that the site had been altered and damaged by recent digging. He stated that he found human bones in the wall of the excavated area, as well as in a pile of dirt discarded during the excavation. He also testified that it appeared that the persons digging had excavated a portion of the human remains and discarded them after screening the dirt in which they were buried.

¶ 5 The magistrate dismissed the charge of abuse or desecration of a dead human body. He made factual findings that the Redds did disinter remains. However, he was uncertain about whether disinterring remains which "presumably are a thousand years old" "constitutes a criminal offense of desecration of a corpse, or abuse or desecration of a dead human body." [3] Therefore, he dismissed the charges, stating that the appellate court could clarify whether the law was meant to apply to these facts.

¶ 6 The State appealed the magistrate's decision to the Utah Court of Appeals. At oral argument before the court of appeals, the Redds' attorney conceded that the bones the Redds had removed constitute a "dead body" as defined by the statute. The court of appeals upheld the magistrate's dismissal on alternative grounds not addressed by the magistrate or briefed by the parties. It reasoned that the statute refers only to dead bodies "buried or otherwise interred" and that this meant that one element of the crime was proof that the body had been intentionally placed "into a place designated for its repose." *State v. Redd,* 954 P.2d 230, 234 (Utah Ct.App.1998). The court of appeals

2. Section 76–9–704(1)(b) reads:
 (1) A person is guilty of abuse or desecration of a dead human body if the person intentionally and unlawfully:
 . . .
 (b) disinters a buried or otherwise interred dead body, without authority of a court order.
 Utah Code Ann. § 76–9–704(1)(b) (1995). In 1999, the legislature amended section 76–9–704. It added a new subsection which reads: "For purposes of this section, 'dead human body' includes any part of a human body in any stage of decomposition including ancient human remains." *Id.* § 76–9–704(1) (1999). However, we apply the law as it existed at the time of the crime charged.
 Defendants were also charged with trespassing on trust lands, in violation of section 53C–2–301(1)(f) of the Code. Defendants were bound over on the trespassing charge; this charge was later refiled and no appeal of the charge has been taken.

3. The magistrate said that there are two schools of thought regarding the appropriate reach of the statute: one adheres to the position "that it doesn't matter how old the remains are, they're still human remains, and they need to be protected from being disturbed. . . . The other school of thought is, 'Hey wait a minute, you know, there's a rule of reason that has to apply here, [the statute is] talking about disturbing human remains that have been buried in a place that's been set aside for the preserving of human remains, the cemetery. . . . [T]hese [Anasazi] remains are scattered all over this part of the country.' "

held that the State had failed to prove that element of the charged crime. The State petitioned for a rehearing, contending that the court should have taken judicial notice of the fact that midden areas were used as burial grounds by the Anasazi. The court of appeals refused to take judicial notice of this fact. It stated, however, "[n]o party to this action should construe our opinion or this order to preclude the State from refiling the charges under the same or a more appropriate subsection of the statute."

¶ 7 The State followed the suggestion of the court of appeals and refiled the charges against the Redds under section 76–9–704(1)(b). Additionally, it charged the Redds under section 76–9–704(1)(a). It alleged that the Redds "did intentionally and unlawfully remove, conceal, fail to report the finding of a dead body to a local law enforcement agency, or destroy a dead body or any part of it," and that they "did intentionally and unlawfully disinter a buried or otherwise interred dead body, without authority of a court order." The State offered new testimony from Davidson, the archaeologist, regarding burial practices of the Anasazi to support these refiled charges. The Redds moved to dismiss the refiled charges, asserting that their due process rights were being violated. They relied on *State v. Brickey*, 714 P.2d 644 (Utah 1986), arguing that the "good cause" showing *Brickey* requires as a precondition for the refiling of dismissed charges exists only when the State has new or previously-unavailable evidence. They asserted that no such evidence existed. Everything Davidson would say was known and available to the State when the first charges were filed. The State responded that it could not have foreseen the need for Davidson's additional testimony until the court of appeals, *sua sponte*, added an element to the crime. The parties stipulated that a ruling on the *Brickey* motion would be reserved until after the preliminary hearing.

¶ 8 A preliminary hearing was held at which Davidson explained that a midden area is "that part of the site where we find the refuse [sic] from human activity.... [V]ery often burials take place in that midden area, because ... it's easy to dig and ... areas that are soft and easy to dig in are very often places—of repose—for humans.... [V]ery often deaths, of course, take place in the winter time when lots of the available ground is frozen and even harder to dig, so those soft areas in the midden are very much utilized as burials." The magistrate bound the defendants over on the refiled original charge, under section 76–9–704(1)(b), of disinterring a buried or otherwise interred dead body without authority of a court order. The magistrate specifically found that the State had shown probable cause to believe that the defendants disinterred human bones that had once been "buried or otherwise interred." However, the magistrate dismissed the second charge, based on section 76–9–704(1)(a) of the Code, of removing, concealing, or failing to report the finding of a dead body to local law enforcement, or destroying a dead body or any part of it. He stated that: "There is no evidence that [the defendants] destroyed, concealed or *removed* a body or even a bone. The most that can be said is that they may have *moved* as many as seventeen bones a few feet. *This is not removal, concealment or destruction.*" (Emphasis added.)

 ¶ 9 The State sought permission to file an interlocutory appeal on the dismissal of the charge under section 76–9–704(1)(a). The Redds did not appeal the bindover on the refiled charge under section 76–9–704(1)(b). The court of appeals granted the State's petition and certified the case to this court. The court of appeals' certification order stated that the appeal involved two issues: the application and interpretation of *Brickey*, and the interpretation and effect of sections 76–9–704(1)(a) and (b) of the Code. However, as noted above, the petition for interlocutory appeal did not address either *Brickey* or 76–9–704(1)(b); rather it raised only the interpretation of 76–9–704(1)(a). Utah Rule of Appellate Procedure 43(a) provides that the court of appeals may "certify a *case* for immediate transfer to the Supreme Court." Utah R.App. P. 43(a) (emphasis added). It does not permit the court of appeals to add issues to the certification not present in the "case" before it. Here, the only issue appealed by the State is the dismissal of the section 76–9–704(1)(a) charge.

**990**

This charge was not dismissed based on *Brickey*, but rather because the magistrate interpreted the statute as not being violated by the movement of human bones. Therefore, we conclude that there is neither a *Brickey* question nor a 76–9–704(1)(b) question before us. The only issue is the proper interpretation of section 76–9–704(1)(a) of the Code.

¶ 10 We begin with the standard of review. The proper interpretation of a statute is a question of law which we review for correctness, according no deference to the magistrate's legal conclusion. *See Gutierrez v. Medley*, 972 P.2d 913, 914–15 (Utah 1998); *State v. Pena*, 869 P.2d 932, 936 (Utah 1994). With this standard in mind, we address section 76–9–704(1)(a). It reads in pertinent part:

> (1) A person is guilty of abuse or desecration of a dead human body if the person intentionally and unlawfully:
>
> (a) removes, conceals, fails to report the finding of a dead body to a local law enforcement agency, or destroys a dead body or any part of it.

Utah Code Ann. § 76–9–704(1)(a) (1995).[4]

¶ 11 We start our analysis with the statute's plain language. "The fundamental rule of statutory construction is that statutes are generally to be construed according to their plain language. Unambiguous language in the statute may not be interpreted to contradict its plain meaning." *Zoll & Branch P.C. v. Asay*, 932 P.2d 592, 594 (Utah 1997) (citations omitted); *see also Kimball Condo. Owners Ass'n v. County Bd. of Equalization*, 943 P.2d 642, 648 (Utah 1997). In the case of unambiguous statutes, this court has a long history of relying on dictionary definitions to determine plain meaning. *See, e.g., Zoll & Branch*, 932 P.2d at 594; *Bryant v. Deseret News Publ'g Co.*, 120 Utah 241, 233 P.2d 355, 356 (1951). At least one part of 76–9–704(1)(a) is unambiguous: one violates the statute if one "removes a dead body." The magistrate found that while the

Redds moved the bones, they did not "remove" them. To determine the correctness of this interpretation, we first resort to the dictionary. The word "remove" is defined variously as: "to change or shift the location, position, station, or residence of" and "to move by lifting, pushing aside or taking away or off." *Webster's Third New International Dictionary* 1921 (1961). Applying this definition to the statute, it seems clear that when the Redds took the bones out of the ground and moved them to the back dirt piles, they "removed" them within the plain meaning of the statute. Therefore, we find the magistrate's construction of the statute to have been in error.

¶ 12 The next question is whether the bones that the Redds removed constituted a "dead body."[5] The statute applies to one who "removes, conceals, fails to report the finding of a dead body to a local law enforcement agency, or destroys a dead body or any part of it." Utah Code Ann. § 76–9–704(1)(a) (1995). This clause can be read in two ways. First, it can be read as prohibiting only (i) the removal, concealment, or failure to report the finding of an intact dead body, or (ii) the destruction of an intact dead body or a part of it. Under this reading, the negative implication is that the statute permits the removal, concealment, or failure to report the finding of body parts. Alternatively, the statute could be read as prohibiting (i) the removal, concealment, failure to report the finding of, or the destruction of (ii) a dead body or any part of it. Where we are faced with two alternative readings, and we have no reliable sources that clearly fix the legislative purpose, we look to the consequences of those readings to determine the meaning to be given the statute. Our clear preference is the reading that reflects sound public policy, as we presume that must be what the legislature intended. *See Schurtz v. BMW of North America, Inc.*, 814 P.2d 1108, 1113 (Utah 1991). In other words, we interpret a statute to avoid absurd consequences. *See Clover v. Snowbird Ski Resort,*

---

4. While this section has been amended, we apply the law as it existed at the time of the crime charged.

5. Although this point was conceded by the Redds' counsel before the court of appeals in the first case, we do not assume that concession is binding for the purposes of this appeal.

808 P.2d 1037, 1045 n. 39 (Utah 1991); *see also Alta Indus. Ltd. v. Hurst*, 846 P.2d 1282, 1292 n. 24 (Utah 1993).

¶ 13 We conclude that the results produced by the first of the two readings proposed, which would restrict the statute's reach to intact human bodies and would not reach the removal, concealment, or failure to report the finding of parts of bodies, such as heads, torsos, arms, legs, bones, or organs, is not in accord with any sound public policy. Therefore, we adopt the second reading: the statute prohibits the removal, concealment, failure to report the finding of, or the destruction of a dead body or any part of it.

¶ 14 On the facts of the present case, it may be that reading this statute as protecting partial remains of a thousand-year-old Anasazi will not accord with the expectations of some persons, as the trial judge noted. *See* note 3, *supra*. But a moment's reflection should demonstrate the soundness of the broader public policy our interpretation advances. It will protect the partial remains of many with whom people today can readily identify, such as pioneers buried long ago in crude graves,[6] or of war dead,[7] or of victims of horrendous accidents,[8] or crimes.[9] Certainly, these remains deserve protection, and we conclude that the legislature intended to grant it in section 76–9–704(1)(a).

■ ¶ 15 Because the Redds "removed" parts of a "dead body," and because the statute applies to body parts as well as whole bodies, we find the magistrate's interpreta-

tion of the statute to be in error. The Redds should have been bound over for trial under section 76–9–704(1)(a) of the Code.

¶ 16 Reversed and remanded.

¶ 17 Chief Justice HOWE, Associate Chief Justice DURHAM, Justice RUSSON, and Judge BENCH concur in Justice ZIMMERMAN'S opinion.

¶ 18 Having disqualified himself, Justice Stewart does not participate herein; Court of Appeals Judge Russell W. Bench sat.

---

6. *See* Conrad Walters, *'Modern Technology' Saves Day in Salvaging Bones*, Salt Lake Tribune, July 26, 1986, at B1 (discussing discovery of bones and teeth of early Mormon pioneer child buried in Fremont Indian midden); *see also* Paul Rolly, *Pioneers to Get New Graves*, Salt Lake Tribune, August 16, 1986, at B1 ("The State Parks and Recreation Board has voted to rebury the remains of 32 early pioneers and Indians discovered near downtown Salt Lake City.").

7. *See* Associated Press, *China Hands Over Remains of Airmen Killed in WWII*, Deseret News, Jan. 17, 1997, available in Deseret News Archives (recounting finding remains of American soldiers who died 52 years earlier, were placed in metal boxes, and returned home).

8. *See* Associated Press, *Did Deactivated Part Trigger Crash?*, Deseret News, Nov. 3, 1999, available in Deseret News Archives ("Authorities have

publicly said they have found only one body and do not expect to find other bodies intact [from Egypt Air airplane crash].").

9. *See State v. Hamilton*, 827 P.2d 232, 234 (Utah 1992) (recounting discovery of murder victim: "Both hands, feet, and breasts, the head, and the left arm had been removed.... [O]fficers ... discovered breast tissue.... The other missing body parts were never recovered."); *see also More Body Parts Found*, Salt Lake Tribune, Nov. 15, 1999, at B2 ("After a two-day search, Duchesne County sheriff's deputies have found more body parts on the Pinder Ranch more than a year after the scattered remains of two bodies were found there.... The victims were shot and their bodies were blown up in an apparent attempt to destroy the evidence.").