2011 UT App 129

**Glenna STEWART, Plaintiff and Appellee,**

v.

**Charles BOVA, M.D., and Pioneer Valley Hospital, Defendants and Appellants.**

No. 20100036–CA.

Court of Appeals of Utah.

April 21, 2011.

Shawn P. Bailey, Logan; and Clark Newhall, Salt Lake City, for Appellee.

Kurt M. Frankenburg, Stephen T. Hester, Brian P. Miller, Kenneth L. Reich, and Christopher W. Droubay, Salt Lake City, for Appellants.

Before Judges McHUGH, ORME, and VOROS.

## OPINION

VOROS, Judge:

¶ 1 The question presented by this appeal is whether an agreement to arbitrate a medical malpractice dispute must, to be enforceable, comply with the specific requirements of the arbitration statute of the Utah Health Care Malpractice Act. *See* Utah Code Ann. §§ 78B–3–401 to –422 (2008). We hold that it must.

## BACKGROUND

¶ 2 On September 16, 2008, Glenna Stewart underwent a lumbar nerve root injection at Pioneer Valley Hospital. The procedure was performed by Dr. Charles Bova. Ms. Stewart was accompanied by her daughter, a registered nurse.

¶ 3 According to Ms. Stewart's declaration, at the hospital she was led to a treatment room and instructed to change into a hospital gown. Ms. Stewart was in "a lot of pain" and was "very anxious." A nurse came into the room with a "stack of papers" and told Ms. Stewart to sign them. However, Ms. Stewart noticed a different patient's name on the top page of the stack of papers and pointed this fact out to the nurse. The nurse brought a new stack of papers and pointed to specific pages for Ms. Stewart to sign. Ms. Stewart signed them. Ms. Stewart was then moved to another room and placed on a table in preparation for the injection. Just before the injection, Ms. Stewart was presented with another paper to sign. She believes that this may have been an arbitration agreement. According to her declaration, Ms. Stewart was not given an explanation about the contents of any of the papers she signed. In particular, she was not encouraged to ask questions about the arbitration agreement or given a chance to read it before signing. The day after the injection, Ms. Stewart saw Dr. Bova for a follow-up appointment and signed a second arbitration agreement. The two arbitration agreements are identical.[1] Ms. Stewart declares that she received copies of neither. Her daughter later stated in an affidavit, "If I had known that there was an arbitration agreement in the documents given to my Mother to sign, I would have instructed her not to sign it."

¶ 4 According to his declaration, Dr. Bova reviewed the Agreement with Ms. Stewart and her daughter prior to the injection. In addition, he answered all of Ms. Stewart's questions regarding the Agreement and confirmed that Ms. Stewart understood the terms of the Agreement. Dr. Bova then observed Ms. Stewart sign the Agreement. Dr. Bova does not, however, contend that Ms. Stewart was verbally encouraged to read the materials or to ask any questions.

¶ 5 Following the injection, Ms. Stewart experienced a loss of sensation and motor function in her leg. She sued Dr. Bova, alleging medical malpractice. Dr. Bova moved to stay the court action and to compel arbitration as required by the Agreement. Ms. Stewart responded that the Agreement is invalid because (1) she was not verbally encouraged to read the materials or ask questions; (2) she was not given a copy of the Agreement; (3) she was not given the written information required by section 78B–3–421(1)(a) of the Utah Health Care Malpractice Act; and (4) the Agreement is unconscionable. The trial court denied Dr. Bova's motion. It ruled that no question of fact existed as to whether Dr. Bova had verbally encouraged plaintiff to read the Agreement and to ask any questions. Consequently, it ruled that the Agreement was not validly executed under section 78B–3–421. The trial court did not address whether the Agreement was otherwise unconscionable. Dr. Bova appeals.[2]

---

1. For simplicity, we refer to the two identical arbitration agreements collectively as "the Agreement."

2. Notwithstanding the fact that Dr. Bova's appeal does not arise from a final judgment or order, we have jurisdiction over it pursuant to Utah Code Ann. § 78B–11–129(1)(a) (2008). That section provides that "an appeal may be taken from ... an order denying a motion to compel arbitration." *Id.; see also Pledger v. Gillespie*, 1999 UT 54, ¶ 17, 982 P.2d 572 (holding that a party may seek review of any order denying a motion to compel arbitration, irrespective of whether the order is a final judgment or has been designated as such under Utah Rule of Civil Procedure 54(b)).

## ISSUE AND STANDARD OF REVIEW

¶ 6 Dr. Bova raises several issues on appeal, but they all resolve into a single question: whether the Agreement is enforceable under section 78B–3–421, the arbitration provision of the Utah Health Care Malpractice Act. "The interpretation of a statute is a question of law that we review for correctness...." *Jaques v. Midway Auto Plaza, Inc.*, 2010 UT 54, ¶ 11, 240 P.3d 769.

## ANALYSIS

### The Agreement Was Not Validly Executed

■ ¶ 7 Generally speaking, "[i]t is the policy of the law in Utah to interpret contracts in favor of arbitration, in keeping with our policy of encouraging extrajudicial resolution of disputes when the parties have agreed not to litigate." *Central Florida Investments, Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 16, 40 P.3d 599 (internal quotation marks omitted). And while "no public policy requires such agreements to be subjected to a different analysis when they are between physicians and patients," *Sosa v. Paulos*, 924 P.2d 357, 359 (Utah 1996), the Utah Legislature has by statute established specific requirements for the valid execution of an arbitration agreement between a patient and a health care provider, *see* Utah Code Ann. § 78B–3–421 (2008). These requirements include terms that must be contained in the arbitration agreement, information the patient must be provided in writing, and information the patient must be verbally told. *Id.* At issue here is this last requirement, what the patient must be told:

(1) After May 2, 1999, for a binding arbitration agreement between a patient and a health care provider to be validly executed ...:

(c) the patient shall be verbally encouraged to:

(i) read the written information required by Subsection (1)(a) and the arbitration agreement; and

(ii) ask any questions.

*Id.* § 78B–3–421(1)(c). The written information required by subsection (1)(a) includes the patient's waiver of the right to have a claim heard by a judge or jury; the patient's

responsibility, if any, for the costs of arbitration; the patient's right to decline arbitration and still receive treatment; the automatic renewal of the arbitration agreement; and the patient's right to rescind the arbitration agreement within ten days. *See id.* § 78B–3–421(1)(a).

¶ 8 Ms. Stewart does not deny that she signed the Agreement. The Agreement provides that she will resolve any claim against Dr. Bova by negotiation, mediation, or arbitration. It also contains a provision reciting that she had the right to ask questions about the arbitration agreement:

I have received a written explanation of the terms of this Agreement. I have had the right to ask questions and have my questions answered. I understand that any Claim I might have must be resolved through the dispute resolution process in this Agreement instead of having them [sic] heard by a judge or jury. I understand the role of the arbitrators and the manner in which they are selected. I understand the responsibility for arbitration related costs. I understand that this Agreement renews each year unless cancelled before the renewal date. I understand that I can decline to enter into the Agreement and still receive health care. I understand that I can rescind this Agreement within 10 days of signing it.

However, Dr. Bova does not contend that Ms. Stewart was verbally encouraged to read the written information required by subsection (1)(a) and the Agreement or to ask any questions.

¶ 9 The trial court ruled that because the uncontested facts demonstrated that the requirements of section 78B–3–421 were not met, the Agreement was not validly executed, and hence, is unenforceable. Dr. Bova challenges this conclusion on several grounds.

A. Compliance with Section 78B–3–421(1)(c)

■ ¶ 10 Dr. Bova contends "that the Agreement complies with the legislatively established requirements to create a presumptively valid and enforceable agreement." He does not contest that Ms. Stewart was not

verbally encouraged to read any materials or to ask any questions. Rather, he argues that "[i]t is simply nonsensical to hold an agreement unenforceable on the basis that only one of many statutory requirements designed to prevent misunderstanding of the terms of an Agreement was not met, when the Plaintiff clearly acknowledges that she understood the terms of the Agreement." In effect, Dr. Bova argues that where the objectives of the statute have been satisfied, substantial compliance was sufficient.

¶ 11 "To interpret a statute, we always look first to the statute's plain language in an effort to give effect to the legislature's intent, to the degree it can be so discerned." *In re Olympus Constr., L.C.,* 2009 UT 29, ¶ 10, 215 P.3d 129. In addition, "[w]hen interpreting a statute, we assume, absent a contrary indication, that the legislature used each term advisedly according to its ordinary and usually accepted meaning." *Hutter v. Dig–It, Inc.,* 2009 UT 69, ¶ 32, 219 P.3d 918. Moreover, " 'effect must be given, if possible, to every word, clause and sentence of a statute.... No clause[,] sentence or word shall be construed as superfluous, void or insignificant if the construction can be found which will give force to and preserve all the words of the statute.' " *State v. Maestas,* 2002 UT 123, ¶ 53, 63 P.3d 621 (quoting Norman J. Singer, 2A *Sutherland Statutory Construction* § 46:06 (4th ed. 1984)).

¶ 12 Here, the language of the statute could not be more clear: "for a binding arbitration agreement between a patient and a health care provider to be validly executed ...:(c) the patient shall be verbally encouraged to: (i) read the [specified] written information ... and the arbitration agreement; (ii) and ask any questions." Utah Code Ann. § 78B–3–421(1)(c) (2008). Ms. Stewart was not verbally encouraged to read the materials or to ask any questions. Accordingly, under the explicit terms of the statute, the Agreement was not validly executed.

¶ 13 Dr. Bova contends that the acknowledgment signed by Ms. Stewart demonstrates that she understood the Agreement and had the opportunity to ask questions. Thus, he reasons, "the overall purpose of the statute" was fulfilled. Undoubtedly, the ultimate goal of this statutory provision is to ensure that the patient understands what she is signing and, to that end, has the opportunity to have her questions answered. However, the Legislature did not merely specify the goal; it also specified, in the clearest terms, the method by which that goal is to be attained. The statute commands, not that the patient reach an understanding of the Agreement, but rather that the patient's understanding be achieved by particular means, including being verbally encouraged to read the materials and to ask questions. *Cf. Crawford v. Washington,* 541 U.S. 36, 61, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (holding that, while the Confrontation Clause's ultimate goal is to ensure reliability of evidence, it "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination"); *accord Gygi v. St. George Surgical & Medical Center, L.P.,* 2005 WL 3536275, 2005 U.S. Dist. LEXIS 38290 (D.Utah) (holding that substantial compliance is insufficient given the "very specific terms" of a different subsection of this statute).

¶ 14 Dr. Bova argues that this reading of the statute undermines the purpose of the statute because it would result in fewer arbitrations. He cites section 78B–3–421 as evidence of "the Legislature's desire to encourage arbitration" in the medical malpractice context. The Legislature does in fact encourage medical malpractice arbitration. But the history of medical malpractice arbitration in Utah has been complicated, if not contentious, involving a delicate legislative balancing of competing interests. *See, e.g., Soriano v. Graul,* 2008 UT App 188, ¶ 2, 186 P.3d 960 (noting that the 2004 statutory amendments came in "response to a public outcry"); Daniel Nelson, Note, *Recent Legislative Developments: Medical Dispute Resolution Amendments,* 2005 Utah L.Rev. 387, 389 (describing public picketing against 2003 amendments concerning arbitration). Section 78B–3–421's detailed requirements reflect careful balancing of the interests of health care providers and their patients.

¶ 15 Requiring compliance with specific patient safeguards before an arbitration agreement is validly executed does create the pos-

sibility that some arbitration agreements will not be validly executed, and thus that some disputes will be litigated rather than arbitrated. We have every reason to believe the Legislature was well aware of this risk and enacted the patient safeguards notwithstanding it. *See Martinez v. Media–Paymaster Plus/Church of Jesus Christ of Latter-Day Saints,* 2007 UT 42, ¶ 46, 164 P.3d 384 ("We presume that the legislature used each word advisedly ...." (internal quotation marks omitted)). Accordingly, we understand the purpose of the section to be to encourage arbitration when statutory safeguards have been observed, but not when those safeguards have been ignored.

### B. The Parol Evidence Rule

¶ 16 Dr. Bova further contends that Ms. Stewart's declarations are inadmissible parol evidence and that the trial court erred by relying on them to contradict the unambiguous terms of the Agreement.

¶ 17 The parol evidence rule "operates, in the absence of fraud or other invalidating causes, to exclude evidence of contemporaneous conversations, representations, or statements offered for the purpose of varying or adding to the terms of an integrated contract." *Tangren Family Trust v. Tangren,* 2008 UT 20, ¶ 11, 182 P.3d 326 (emphasis and internal quotation marks omitted). "Thus, if a contract is integrated, parol evidence is admissible only to clarify ambiguous terms; it is not admissible to vary or contradict the clear and unambiguous terms of the contract." *Id.* (internal quotation marks omitted). However, "extrinsic evidence is appropriately considered, even in the face of a clear integration clause, where the contract is alleged to be a forgery, a joke, a sham, lacking in consideration, or where a contract is voidable for fraud, mistake, or illegality." *Id.* ¶ 15. "Such invalidating causes need not and commonly do not appear on the face of the writing." Restatement (Second) of Contracts § 214 cmt. c (1981).

¶ 18 Noncompliance with section 78B–3–421 is just such an invalidating cause. Ms. Stewart alleges that Dr. Bova and his staff did not comply with the requirements of the statute. Compliance with statutory require-

ments is essential for a medical malpractice arbitration agreement to be "validly executed." Utah Code Ann. § 78B–3–421(1) (2008). Thus, Ms. Stewart is not attempting to vary or add to the terms of the Agreement, but to demonstrate that it was not validly executed, just as if she had alleged that the Agreement was "voidable for fraud, mistake, or illegality." *Tangren,* 2008 UT 20, ¶ 15, 182 P.3d 326. Accordingly, her testimony is not excluded by the parol evidence rule.

### C. Problems of Proof

¶ 19 Finally, Dr. Bova contends that "[t]he burden of proving verbal encouragement by extrinsic evidence is nearly impossible to meet." "Absent a recording of the conversation," he reasons, "there is no way to positively prove that such a verbal exchange occurred," raising the specter of "dueling affidavits." Therefore, he concludes, reading the statute to require such proof would lead to "absurd consequences," *State v. Redd,* 1999 UT 108, ¶ 12, 992 P.2d 986 (noting that statutes should be interpreted to avoid absurd consequences), and accordingly would not be a "reasonable and sensible construction," *State v. Garcia,* 965 P.2d 508, 512 (Utah Ct.App.1998) (quoting *State v. GAF Corp.,* 760 P.2d 310, 313 (Utah 1988)).

¶ 20 To begin with, we do not agree that the plain language of section 78B–3–421(1)(c) places on health care providers a uniquely difficult—or even unusual—evidentiary burden. The evidentiary difficulties associated with proof of verbal encouragement are certainly no greater than those associated with other invalidating causes, such as where a contract is alleged to be "a forgery, a joke, a sham, lacking in consideration, or ... voidable for fraud, mistake, or illegality." *Tangren,* 2008 UT 20, ¶ 15, 182 P.3d 326. Moreover, knowing in advance that one might later be called upon to prove a particular fact is a great advantage to a potential litigant. Dr. Bova recognizes that various methods of proof are available, but contends that these methods are not feasible or fall short of positive proof.

¶ 21 We recognize that "a court should not follow the literal language of a statute if its

plain meaning works an absurd result." *In re Z.C.,* 2007 UT 54, ¶ 11, 165 P.3d 1206 (internal quotation marks omitted). On the other hand, "[o]ur task is to interpret the words used by the legislature, not to correct or revise them." *State v. Wallace,* 2006 UT 86, ¶ 9, 150 P.3d 540. We do not agree that requiring health care providers to prove compliance with the arbitration statute's requirements by means normally employed to prove facts is a result "so absurd that the legislative body which authored the legislation could not have intended it." *In re Z.C.,* 2007 UT 54, ¶ 13, 165 P.3d 1206.

### D. Unconscionability

¶ 22 In the trial court, Ms. Stewart argued that, in addition to not being validly executed under section 78B–3–21, the Agreement was procedurally unconscionable due to the manner in which Dr. Bova's staff procured her signature on the document. Because the trial court ruled that the Agreement was unenforceable under section 78B–3–421, it did not rule on whether it was procedurally unconscionable. Nevertheless, on appeal, Dr. Bova contends that the Agreement is not procedurally unconscionable under *Sosa v. Paulos,* 924 P.2d 357 (Utah 1996).

¶ 23 Whether the Agreement suffers from procedural unconscionability or not, it is unenforceable under section 78B–3–421. Therefore, like the trial court, we have no need to address the question of unconscionability and decline to do so.

### CONCLUSION

¶ 24 We affirm the trial court's ruling that the Agreement was not validly executed under section 78B–3–421 and is therefore unenforceable. We remand for further proceedings.

¶ 25 I CONCUR: CAROLYN B. McHUGH, Associate Presiding Judge.

ORME, Judge (concurring):

¶ 26 I concur in the court's opinion. I write separately to comment on a point made in the lead opinion and to share a concern about the practical implications of the statutory requirement that patients be encouraged to ask questions before signing the arbitration agreement.

¶ 27 The lead opinion observes that "[r]equiring compliance with specific patient safeguards before an arbitration agreement is validly executed does create the possibility that some arbitration agreements will not be validly executed, and thus that some disputes will be litigated rather than arbitrated." *Supra* ¶ 15. While this may be true, it is not a function of the legislation but rather of lax practices on the part of health care providers. In other words, this is something entirely within the control of health care providers. They have the ability to make sure arbitration agreements are validly executed. And it is a simple matter to encourage a patient to read an arbitration agreement and to ask any questions.[1]

¶ 28 The Legislature's directive that a patient be encouraged to ask questions could not be more clear. And the provider in this case did not demonstrate compliance with this directive. While that ends our inquiry in this case, I do wonder what the point of the exercise is. In my experience, the arbitration agreement is just tucked into a packet that includes health questionnaires, insur-

---

1. Documenting statutory compliance is not overly burdensome. A recording could be made easily enough. But a checklist in which the patient checks and initials the provider's compliance with each required step would also be adequate, as would the patient's signing an affidavit or declaration outlining the steps that had been taken. Any hindrances to taking these measures are not inherent in the statutory scheme but rather are practical ones. Implementing such measures will slow down the processing of patients. Anticipating the possibility of malpractice and dwelling on the intricacies of arbitration may negatively affect provider-patient relations. And, of course, careful compliance with the statutory requirements may result in fewer acceptances of arbitration, even as it makes rock-solid those acceptances that are given.

Whether it is worth the trouble is up to the provider. The statute in question authorizes malpractice arbitration agreements if specific requirements are complied with. But such agreements are not mandated. I think that the policy of the statute is not to encourage the use of malpractice arbitration agreements per se, but rather to encourage their use only when they have been fully explained, are fully understood, and are acceptable to a fully-informed patient.

ance forms, privacy notices, etc. As such, it is handled by front office personnel, not the medical provider. But whether it is the receptionist, nurse, or doctor who encourages the patient to take a few minutes to carefully read the required statement and the agreement and then to ask any questions, I wonder if any of them are qualified to answer the questions that are germane: Will I be as readily able to secure the services of an attorney if the case is arbitrated rather than handled in court? What are the differences in costs, including the cost of legal counsel, for arbitration versus traditional litigation? What are the differences in terms of both liability determinations and the range of monetary awards between malpractice cases adjudicated by arbitration tribunals and those adjudicated in court? Are there differences in the admissibility of evidence as between arbitration and a court proceeding? Which procedure is likely to be concluded more quickly?

¶ 29 I'm guessing that when put to medical office personnel, such questions will invariably be met with blank stares, looks of astonishment, and candid answers of "I honestly don't know." If the goal of the Legislature is to make sure arbitration agreements are only entered into by fully informed patients—and that is the clear thrust of the statute—an opportunity to ask questions of someone not qualified to answer them may not be the best way to accomplish that goal. Perhaps a brochure that the patient would be encouraged to read would better serve the purpose. Patterned roughly after the familiar Utah Voter Information Pamphlet, it could begin with a neutral explanation of traditional litigation and arbitration, the statute authorizing malpractice arbitration agreements, and the steps required for entering into a valid arbitration agreement. This could be followed by a statement in favor of arbitration by, perhaps, the Utah Medical Association or the Utah Hospitals and Health Systems Association, and a statement against by, say, the Utah Association for Justice.

¶ 30 True, fewer of the arbitration agreements would be signed. But those that were signed would be signed by people who understood what they were doing. And that seems to be the point of the statutory framework adopted by our Legislature.