2005 UT 8

Nichole ADAMS, Chair of the Salt Lake Democratic Party; and Donald Dunn, Chair of the Utah Democratic Party, Plaintiffs and Appellees,

v.

Sherrie SWENSEN, Salt Lake County Clerk, Defendant and Appellant.

Salt Lake County Republican Party, Intervenor and Appellant.

No. 20040922.

Supreme Court of Utah.

Feb. 1, 2005.

Karl L. Hendrickson, Gavin J. Anderson, Dahnelle Burton–Lee, David E. Yocom, Salt Lake City, for defendant.

Scott Daniels, Salt Lake City, for plaintiff.

James S. Jardine, Matthew Lewis, and N. Arron Murdock, Salt Lake City, for intervenor.

NEHRING, Justice:

¶ 1 In this appeal, we are asked whether a physician's letter concerning the condition of Salt Lake County Mayor Nancy Workman was sufficient to permit the Salt Lake County Republican Party to replace Mayor Workman on the ballot for the November 2, 2004 general election for the office of Salt Lake County Mayor. The district court ruled that the letter was not sufficient and entered an order barring Salt Lake County Clerk Sherrie Swensen from removing Mayor Workman's name from the ballot. We reverse.

## FACTUAL BACKGROUND

¶ 2 Salt Lake County Mayor Nancy Workman was nominated by the Salt Lake County Republican Party to run for reelection in the general election to be held on November 2, 2004. Her name was certified by the Lieutenant Governor and submitted to Ms. Swensen, the Salt Lake County Clerk, to be included on the election ballot.

Several months before the general election, Mayor Workman was charged with two felonies relating to alleged misuse of county funds. The district court held a preliminary hearing on the charges against Mayor Workman on October 4, 2004. At its conclusion, she was bound over for trial.

¶ 3 The next day, the Salt Lake County Republican Party withdrew its support from Mayor Workman and endorsed the write-in candidacy of Mr. Ellis Ivory. In short order, Mr. Ivory filed a declaration of his candidacy as a write-in candidate.

¶ 4 Mayor Workman then filed an affidavit in which she withdrew her candidacy. As grounds for her withdrawal, she cited Utah Code section 20A–1–501(1)(b)(ii), which authorizes a political party to replace a candidate on the ballot who "resigns because of becoming physically or mentally disabled as certified by a physician." Utah Code Ann. § 20A–1–501(1)(b)(ii) (2003). Her affidavit was accompanied by a letter from a physi-

cian, Philip L. Roberts, M.D. The letter stated:

> To Whom It May Concern:
>
> I am Nancy Workman's treating physician; I have examined her with respect to her current health. She is suffering extraordinary stress as a result of the circumstances surrounding her pending criminal prosecution. In my opinion, the strain upon her physical and emotional condition disables her from continuing as a political candidate without unreasonably comprising [sic] her health.

¶ 5 The Republican Party then certified Mr. Ivory as the party's candidate and sought to replace Mayor Workman's name on the ballot with Mr. Ivory's. On October 27, 2004, Ms. Swensen accepted the Republican Party's certification of Mr. Ivory and placed his name on the ballot. On the same day, the plaintiffs, who are the chairs of the Salt Lake County and Utah State Democratic Parties, filed this action against Ms. Swensen, challenging her decision to place Mr. Ivory on the ballot. Ms. Swenson almost immediately moved for summary judgment.

¶ 6 That afternoon, the district court conducted a hearing on Ms. Swensen's motion. The court ruled that Dr. Roberts's letter was ambiguous and therefore did not meet the requirements of section 20A–1–501(1)(b)(ii). As a result, it rejected Mr. Ivory's eligibility as a replacement candidate for Mayor Workman. Ms. Swensen, together with the Salt Lake County Republican Party, which had been granted leave to intervene, appealed. We heard oral argument the morning of October 28, 2004. In recognition of the urgency of the matter, we issued an order reversing the district court order that afternoon and indicated our intention to follow our order with this written opinion.

## ANALYSIS

¶ 7 The outcome of this appeal turns on an interpretation of Utah law. We review the district court's ruling for correctness and do not defer to its legal interpretation. *State ex rel. Office of Recovery Servs. v. Streight,* 2004 UT 88, ¶ 6, 2004 WL 2416054, —— P.3d ——. The focus of our statutory interpreta-

tion is Utah Code section 20A–1–501, which sets forth circumstances under which a political party's certified candidate may be replaced on the ballot. Utah Code Ann. § 20A–1–501 (2003). Among this provision's approved reasons for designating a substitute candidate is the one on which Mayor Workman and the Republican Party relied, the resignation of a candidate "because of becoming physically or mentally disabled as certified by a physician." *Id.* § 20A–1–501(1)(b)(ii).

■ ¶ 8 We begin our interpretive mission by examining the text of Utah Code section 20A–1–501(1)(b)(ii). If its meaning can be extracted from the "plain language" of that text, we need not apply other interpretative tools. *Dick Simon Trucking, Inc. v. Utah State Tax Comm'n,* 2004 UT 11, ¶ 17, 84 P.3d 1197.

¶ 9 Section 20A–1–501 identifies two discrete time periods in the elective process when a candidate may be replaced: one, after the period for filing declarations of candidacy has ended, but before the primary election; and another, after the primary election, but before the general election. Utah Code Ann. § 20A–1–501(1)(a)–(b). The statute also assigns conditions for naming a replacement candidate. *Id.* Some of these conditions, including death, disqualification by an election officer for improper filing or nominating procedures, and the ground asserted here—resignation "because of becoming physically or mentally disabled as certified by a physician"—apply to both time periods. *Id.* A political party may also name a candidate after the primary election to replace a candidate who has resigned to become a candidate for President or Vice President of the United States. *Id.* § 20A–1–501(1)(b)(iv).

¶ 10 Plaintiffs contend that the disability provision of section 20A–1–501(1)(b)(ii) provides no guidance concerning the type of disability entitling a political party to name a replacement candidate. They invite us to fill this void by construing "disability" to mean an inability to be "gainfully employed," presumably as the Salt Lake County Mayor. They then turn to the contents of Dr. Roberts's letter, arguing that it fails to categorically state that Mayor Workman was disabled from performing the duties of Salt Lake County Mayor as of the date of the letter, and thus, the Republican Party has failed to satisfy the statutory standard for certifying Mr. Ivory to replace Mayor Workman on the ballot.

¶ 11 Even assuming we deemed it proper to fill by judicial edict a perceived lack of definition of the term "disability," we can find no compelling reason to choose the plaintiffs' preferred definition of "disability" over other plausible standards against which "disability" could be measured. For example, because the statute expressly covers the time period during which the allegedly disabled person is a candidate, "disability" could logically mean an inability to meet the demands of a political campaign, rather than an incapacity to perform the duties of Salt Lake County Mayor.

¶ 12 Anticipating our reluctance to inject the statute with court-conjured meaning, plaintiffs argue that the legislature has signaled its preference for a narrow interpretation of "disability" in its selection of the other reasons for candidate replacement authorized in the statute, that is, death, disqualification, and presidential or vice-presidential candidacy are each unambiguous and narrow. From the observation that the three criteria for replacing a candidate are narrow, and the fourth is not, plaintiffs would have us discover a trend that expresses the legislature's intent to achieve a uniformly restrictive application of all of the candidate replacement criteria.

¶ 13 Plaintiffs support their argument for interpretive consistency by contending that a uniformly strict set of replacement criteria serves the policy objective of promoting full candidate exposure to the electorate. However, this argument oversimplifies the question. Were we faced with a statute enacted to advance a single public policy, we might well look to that policy to help gauge the meaning of a statutory provision. *See State v. Redd,* 1999 UT 108, ¶ 12, 992 P.2d 986 ("Where we are faced with two alternative readings, and we have no reliable sources that clearly fix the legislative purpose, we look to the consequences of those readings to determine the meaning to be given the stat-

ute. Our clear preference is the reading that reflects sound public policy, as we presume that must be what the legislature intended.") But here, we confront two competing policy objectives: the principle that the electorate is best served when a candidate holds herself out to the public for a period of time sufficient to be fully examined, and the countervailing policy objective of promoting access to the ballot and affording voters the opportunity to meaningfully exercise their franchise.[1]

¶ 14 Because neither the text nor the underlying policies provide any illumination as to the intended breadth of the term "disability," we cannot confidently claim any insight into the legislature's intentions concerning the breadth of the term "disability" from the content of the three other replacement criteria of section 20A–1–501(b). It is equally plausible that, by making the fourth criteria less narrow than the first three, the legislature intended that the disability provision should be significantly more encompassing than the others. That the disability element contains no standard of measure tells us nothing of whether that absence reflects an act of legislative carelessness or calculation.

¶ 15 Plaintiffs also enlist *Utah State Democratic Committee v. Monson*, 652 P.2d 890 (Utah 1982), in aid of their narrow interpretation cause. Claimed by plaintiffs to be "controlling," *Monson* turned back the quest of a congressional candidate to be placed on the ballot when he had filed his state declaration of candidacy form one day late. *Id.* at 891–93. There, the Democratic Party asked that the candidate's twenty-one-hour tardiness be excused because, among other reasons, the candidate had timely filed his federal declaration of candidacy form. *Id.* at 892. In *Monson*, the Democratic Party invoked the same argument advanced by the intervener Republican Party here: that statutory provisions mandating liberal application of the election law justified its candidate's access to the ballot. *Id.* at 893. We concluded that statutory interpretative directives cannot be employed to alter clear and inflexible

statutory requirements. *Id.* Referring to the statutory provision that required a would-be candidate to timely file a declaration of candidacy form, we stated that legislative directives that election laws be liberally construed "avail us nothing because there is nothing to construe where there is no ambiguity in a statute." *Id.*

¶ 16 Plaintiffs read *Monson* to stand for the proposition that we have neutered the liberal construction directive and will strictly interpret statutory prerequisites to ballot access. This claims too much for our holding. In *Monson*, we did not write the liberal construction mandate out of the law, but rather clarified the ground rules of its application.

¶ 17 A plain language reading of the statute in this case does result in making *Monson* controlling, but in a manner favoring defendant. It is true, that when confronted with malleable statutory language, our shaping of its meaning will be guided by the policy of encouraging ballot access, but we are not prepared to concede that the absence of an articulated standard for "disability" in section 20A–1–501(1)(b)(ii) creates an ambiguity that warrants falling back on interpretative guidelines.

¶ 18 Plaintiffs would have us engage in a two-step process, first defining disability, and then testing Dr. Roberts's letter against our standard. We believe that the plain language of the statute requires a less judicially intensive process. Read literally, section 20A–1–501(1)(b)(ii) defines physical or mental disability as what a physician certifies it to be. While some may question the wisdom of ceding such broad authority to a physician, no one has suggested that the legislature cannot do so. Just as extratextual interpretive tools could not alter the narrow and inflexible statutory mandate that barred ballot access to the would-be candidate in *Monson*, those interpretive aids play no role in narrowing the legislature's broad grant of discretion to a physician in defining the nature of a resigning candidate's disability.

1. The Utah Election Code expressly adopts this principle to guide primary elections, stating that "[t]his part shall be construed liberally so as to ensure full opportunity for persons to become candidates and for voters to express their choice." Utah Code Ann. § 20A–9–401 (2003).

¶ 19 The district court interpreted section 20A–1–501(1)(b)(ii) to mean that it "does not require any particular words or order of words to allow a political party to substitute a candidate" but "does require that the physician's certification be not ambiguous." Then, finding the letter provided by Dr. Roberts to be ambiguous, the district court refused to permit Mr. Ivory to replace Mayor Workman on the ballot. Given our conclusion that the statute delegates to the physician the authority to define disability, we find that the district court applied excessive rigor in assessing the degree of precision required of a physician's certification under section 20A–1–501(1)(b)(ii).

¶ 20 We agree with the district court that the statute does not require that a physician use any particular words to conform to its mandate and disagree with plaintiffs insistence that, to be effective, Dr. Roberts's certification must state that Mayor Workman "is disabled." Plaintiffs' base their quest for linguistic specificity on their contention that to require less would be to invite abuse of the statute for naked political expediency. We concede that to couple a generous reading of the statute with an expansive view of permissible renderings of a physician's certification of disability may invite manipulation. We are not convinced, however, that the potential exploitation of this device outweighs the goal of promoting electoral choice. Moreover, we believe it unwise to assume that the electorate is unable to perceive political manipulation and police it in the polling booth.

¶ 21 We also concede that Dr. Roberts's certification letter is guarded in tone and suffers from lapses in diction. We are persuaded, however, that the certification letter sufficiently communicates Dr. Robert's conclusion that Mayor Workman was physically and emotionally disabled, and that it satisfies the broadly drawn certification requirement of section 20A–1–501(1)(b)(ii). Moreover, we do not believe it appropriate to disqualify Dr. Roberts's certification for a lack of temporal precision as advocated by plaintiffs. They attack the contents of the letter because it does not certify that Mayor Workman was "currently disabled." This is an exceedingly fine hair to split. Dr. Roberts makes clear that Mayor Workman was "suffering extraordinary stress" and "strain upon her physical and emotional condition." These references are descriptive, not predictive. They describe Mayor Workman's condition at the time Dr. Roberts evaluated her, a condition Dr. Roberts certifies as disabling. The statute requires nothing more.

¶ 22 As we noted in our order of October 28, 2004, we express no opinion as to whether Mayor Workman is, in fact, disabled. Our duties as members of this court do not entirely remove us from exposure to the various forms of news media. We are mindful that Mayor Workman herself took pains not to endorse her disability status, choosing instead to make light of it by diagnosing herself to a news reporter as "discombobulated." She honored neither herself nor the political process by engaging in conduct which featured poorly camouflaged hints that she was acceding to a disability resignation as part of a strategic charade. Many responsible citizens viewed as unseemly the events surrounding the resignation of Mayor Workman as a candidate and her replacement by Mr. Ivory. The eventual outcome of the Salt Lake County mayoral election may well be explained, at least in part, by an electorate voicing its dismay over this process. By concluding that the Salt Lake County Clerk acted properly when she placed Mr. Ivory on the ballot, we do not intend to confer praise on those events. We believe, however, that the task of preventing the recurrence of this situation rests with the legislature, not this court. The order of the district court is therefore reversed.

¶ 23 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING'S opinion.